J-A23005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| S.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| L.H. | : | |
| | : | |
| Appellant | : | No. 737 MDA 2023 |

Appeal from the Order Entered May 16, 2023
In the Court of Common Pleas of York County Civil Division at No(s):
2017-FC-001756-03

BEFORE:  LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:            **FILED: DECEMBER 18, 2023**

L.H. (Mother) appeals from the order, entered in the Court of Common Pleas of York County, Family Division, granting Appellee S.C. (Father) unsupervised partial custody of the parties' child, B.C. (born 04/2015). Because the record does not support a finding that the trial court's order is in B.C.'s best interests, we are constrained to vacate.[1]

The parties were married on May 19, 2012.  B.C. (Child) was the only child born of the marriage.  The parties separated in 2017 after Father

---

[*] Former Justice specially assigned to the Superior Court.

[1] On May 25, 2023, Mother filed an application for supersedeas in this Court. **See** Pa.R.A.P. 1732.  On June 15, 2023, a motions judge entered an order denying, in part, and granting, in part, the application, on a temporary basis, effectively staying the custody order to the extent it granted Father unsupervised physical custody.

admitted that he had impure thoughts about Child. The parties divorced in March 2018 and Mother remarried in 2019. Child has been residing with Mother since the parties' divorce.

On September 8, 2017, a general protective services (GPS) referral, alleging Father was an imminent risk, was made to York County Office of Children, Youth, and Family (OCYF). Specifically, the referral alleged that Father "had texted [Mother] [and] in the text it appears [Father] claims he had abused [Mother]. The text also appears to state that [**Father**] **was having sexual curiosity regarding** [**Child**]."[2] Defendant's Exhibit 9, at ¶ 3 (emphasis added).[3] Mother also alleged that, in August 2017, Father had hit Child on the leg, resulting in a red mark. *Id.* at ¶ 7. When asked why Father

_____

[2] In 2017, Father became aware of his sisters' (Child's paternal aunts) allegations that they had been sexually abused by their father, Child's paternal grandfather, when they were younger. Paternal grandfather is in prison in South America for those offenses. During the pendency of the current custody battle there was an ongoing investigation into paternal grandmother's knowledge of the abuse; however, Father presented documentation indicating that the matter was closed on March 30, 2022. In any event, on May 27, 2022, the court entered an interim order stating that Father shall not introduce Child to paternal grandmother, who had moved to the United States.

[3] In text messages sent to Mother in 2017, Father admitted that he was physically and sexually abusive to Mother during their marriage and that he "was just like [his] dad." *See* Mother's Exhibit 5 (iMessage from Father to Mother), 9/14/17. Mother testified that she was abused by Father on a weekly basis before their separation. *See* N.T. Custody Trial, 5/10/23, at 23-25. Father, on the other hand, testified that he physically abused Mother on "two or three" occasions during their marriage. *Id.*, 4/24/23, at 64 (Father testifying he "grab[bed Mother] and h[eld] her very tightly by the arm" on one occasion and on another occasion "grab[bed Mother] by the face with [his] hands and . . . d[u]g [his] fingernail in").

had hit Child, Father told Mother that Child 'has to learn how to wait.'" ***Id.*** Finally, Mother alleged that on another date in August 2017, Mother heard a "smack," and ran to the bedroom where Child was "screaming and crying" in Father's presence. ***Id.*** Father told Mother, "I told her no, when I say no that's how it is." ***Id.*** OCYF deemed the referral validated and closed the case on November 1, 2017.

On September 8, 2017, Mother filed a protection from abuse (PFA) petition, listing Child as the protected party. In the petition, Mother averred that she had received a text message from Father stating, "he had thoughts of finding some sort of sexual curiosity fulfilled in [his]own daughter [and that it] is perverse, is warped, messed up, without excuse, and not normal." PFA Petition, 9/8/17, at ¶ 6 (Mother's Exhibit "7"). After conducting an *ex parte* proceeding, the court denied Mother's request for a temporary PFA order, concluding that "the minor child is not in immediate and present danger of abuse." Order, 9/8/17, at 2. However, on October 23, 2017, the court entered a PFA order, against Father, "by [a]greement [and] **without admission of wrong**[-]**doing.**" Final PFA Order, 10/23/17, at 2 (emphasis added); ***see also*** N.T. Custody Trial, 6/7/23, at 67. The order mandated that Father not "abuse, harass, stalk[,] or threaten [Child] in any place [and] shall not contact [Child] . . . by telephone or by an[y] other means through third persons[.]" Final PFA Order, 10/23/17, at 1. The order also included a limited contact provision, providing that Father "may phone call the minor child only"

once a week and that Father was permitted to have supervised[4] visitation with Child "2 times per month (once every 2 weeks)." *Id.* at 2. The order expired on April 23, 2019.

On January 21, 2019, Father underwent a psychological risk-of-harm evaluation by Kasey Shienvold, Psy.D., which included the administration of the MMPI-2 (personality inventory assessment) and STAXI-2 (anger assessment) tests. Father sought the evaluation "in an attempt to increase his time with [Child] and eliminate the supervision requirement [of his visits]." *See* Psychological Reevaluation by Kasey Shienvold, Psy.D., 9/28/21, at 1. In his evaluation, Dr. Shienvold acknowledged that Father told him Mother had filed a PFA petition against Father in August 2017 claiming that he had "used harsh physical punishment and that [Father] was a risk to molest [Child]." Psychological Evaluation by Kasey Shienvold, Psy.D., 1/21/19, at 2. Doctor Shienvold's evaluation also noted that Father: had stated a CYS investigation was found to be indicated for risk of sexual curiosity regarding Child; had self-reported a "long history of internet pornography addiction" dating back to 2014; "used masturbation and pornography as a means of relieving stress or tension" during his marriage to Mother and admitted that he "may have [had] impure thoughts about [Child]." *Id.* Father told Dr. Shienvold that although he may have had these thoughts about Child, he never considered having

_____

[4] Jay Smeltzer, maternal grandfather, and Mother served as Father's visitation supervisors who were "required to execute and file an affidavit of accountability" with the Prothonotary prior to Father exercising any rights of supervised custody[.] Final PFA Order, 10/23/17, at 2.

actual sexual contact with Child, was never aroused by the thoughts, and deemed the thoughts "loathsome." *Id.*; *see also* N.T. Custody Trial, 4/24/23, at 78 (Father testifying he never had "corresponding desire on [his] part or temptation that these [thoughts about Child] . . . arose to the level of a positive desire to do those kinds of things or engage in those kinds of behaviors").

Doctor Shienvold made the following psychological profile assessment of Father, based on the results of the two administered tests:

> [Father's] psychological testing showed a young man in acute emotional distress. His responses painted a picture of significant depression and anxiety mixed with stimulant-seeking behavior. [Father] is likely shy, insecure[,] and socially inept. He appears to withdraw into fantasy as a means of normalizing his shameful thoughts. [Father] likely experiences intense anger in the face of perceived criticisms or negative comments. And, his scores suggest that he is very likely to express his anger outwardly toward other people or objects by verbal or physical means.

Psychological Evaluation by Kasey Shienvold, Psy.D., 1/21/19, at 3. Doctor Shienvold's evaluation deemed Father to be **at least a moderate risk to Child** due to Father's "significant anxiety and depression[,] inability to modulate his emotions[,] and concerns about his maladaptive coping skills and tendency toward angry, controlling behavior in times of increased stress." *Id.* (emphasis added). Finally, Dr. Shienvold recommended Father engage in dialectical behavioral therapy (DBT) and, when completed, participate in a follow-up evaluation "to determine if he is less of a risk to [Child]." *Id.* at 4.

Father attended an intensive outpatient DBT (IOP/DBT) program for 13 weeks; Father continues to attend therapy sessions with the pastor at his

church.    ***See*** Father's Exhibit "G" (June 8, 2021 letter from Pennsylvania Psychiatric Institute confirming Father's graduation from IOP/DBT program at Pennsylvania Psychiatric Institute; Father consistently attended three group sessions and one individual therapy session, weekly); ***see also*** N.T. Custody Trial, 4/24/23, at 39 (Father testifying he continues to engage in weekly pastoral counseling sessions).  Father's DBT therapist and program manager found that "there was no clinical indication that [Father] needed to continue in the DBT program [where] he displayed motivation to change and willingness to participate [in sessions,] responded well to [the] group skill training format[,] and effectively worked with [his] individual therapist on curbing impulsive behaviors, recognizing and regulating his emotions, and setting more effective interpersonal limits."    ***Id.***[5]    The IOP/DBT therapy Father participated in was "designed for use with clients who are struggling with emotional and behavioral dysregulation."  Father's Exhibit "G" (June 8, 2021 letter from Pennsylvania Psychiatric Institute.

---

[5] Doctor Shienvold's office contacted Mother, by leaving a voicemail on her answering machine, to participate in the evaluation; Mother testified, however, that she was advised not to participate "since there was no active [c]ourt [o]rder for [it]."  ***See*** N.T. Custody Trial, 5/10/23, at 27, 30, 51-52. Interestingly, Mother's petition for special relief and pre-trial conference memorandum faults Father for not contacting Mother to participate in either of Dr. Shienvold's evaluations.  ***See*** Petition for Special Relief, 5/19/22, at ¶ 13 ("Father obtained a Threat of Harm evaluation from Dr. Kasey Shienvold on January 21, 2019.  The evaluation did not consult with Mother or, for that matter, any other source than Father."); ***see also*** Memorandum for Custody Pre-Trial Conference, 10/5/22, at II (same).

Doctor Shienvold re-evaluated Father on September 28, 2021;[6] the re-evaluation included administration of the same tests used during his initial evaluation in January 2019, a clinical interview with Father, a review of records from Father's IOP/DBT treatment program, and a summary report from Father's pastor. *See* Psychological Re[-]evaluaton by Kasey Shienvold, Psy.D., 9/28/21, at 1. Doctor Shienvold concluded that there is no significant evidence that Father has problems with impulse control or self-centeredness. Although Dr. Shienvold acknowledged that Father still experiences elevated levels of anger, he concluded that the test results showed that Father is "much better at controlling his external expressions of anger and his ability to prevent it from compromising his thinking." *Id.* at 2.

Overall, Dr. Shienvold found that Father made "significant progress through his use of counseling" over the past two years [and that] Father "is no longer struggling in emotional crisis [or] having difficulty managing his thinking, feelings, and actions." *Id.* at 3. Doctor Shienvold concluded that Father's risk to Child is "significantly mitigate[d]" by Father's focus on self-improvement and willingness to reach out to others for help. *Id.* Finally, Dr. Shienvold found that Father's desire to have a healthier and more consistent relationship with Child appears to be a genuine and significant motivating factor for him. Moreover, "[a]ssuming that [Father] is willing to continue using his church and counseling as a resource for self-improvement," Dr. Shienvold

---

[6] This occurred prior to Father's filing of the custody complaint.

opined that Father "**is not a significant risk** to the psychological and physical health of [Child] at this time." *Id.* (emphasis added).

On March 23, 2022, Father filed a custody complaint seeking "shared physical and legal custody of [C]hild[,]" and more specifically, expanded unsupervised partial physical custody. Custody Complaint, 3/23/22, at 4. On May 18, 2022, following a conciliation conference, which included an opportunity for the conciliator to speak one-on-one with Child, the court entered an interim custody order, pending trial. The interim order granted sole legal and primary physical custody to Mother and **supervised** partial physical custody to Father. Father's visits were increased to three-hour weekly visits and two weekly phone calls with Child. *See* Interim Custody Order, 5/18/22, at 3-5. Father's parenting plan, submitted to the court prior to trial, indicated that he would grant Mother sole legal custody of Child as it relates to discipline, that the parties would otherwise share legal custody of Child, and that Mother would retain primary physical custody while Father would receive partial physical custody of Child every other week from Saturday at 5 PM until the following Tuesday at 6 PM. *See* Trial Court Scheduling Order, 12/19/22, at 7.

In anticipation of trial, Mother hired an expert witness, Amy Swope, Ph.D., to conduct a risk-of-harm evaluation of Father. In June 2022, Dr. Swope met with Father on two occasions to conduct clinical interviews and,

ultimately, completed a 45-page report, dated June 28, 2022,[7] detailing her results. In addition to Father's clinical interviews, Dr. Swope used the following to complete her report: a biopsychosocial history form, records (including Dr. Shienvold's evaluations and Mother's statement); collateral interviews (of Mother, Father's Church Elder, Father's Pastor, and Father's visitation supervisor); and three tests—the AASI-3 (sexual-interest assessment/Abel assessment),[8] MCMI-IV (mood/personality functioning measure), and the MMPI-2 (personality inventory assessment). Doctor Swope concluded that, until Father can demonstrate "over time" that his risk of recidivism (for committing sexually deviant and abusive behavior) has been "adequately reduced," he should not be given unsupervised visitation with Child. Psychological Risk of Harm Evaluation by Amy M. Swope, Ph.D., 6/28/22, at 43.

In her professional judgment, Dr. Swope opined that "[w]ithout adequate, appropriate treatment for sexually deviant and abusive behavior patterns, [Child] will remain at risk while in [Father's] care." *Id.* In particular, Dr. Swope testified that Father "rationalized and minimized [the abuse in his marriage] and blamed [Mother]." N.T. Custody Trial, 3/28/23, at 111. Doctor Swope also highlighted the fact that Father lacked control over his reaction to sexual photographs he was shown during her evaluation, where "his reaction time data show[ed] that he looked at pictures of women being

_____

[7] Doctor Swope's report incorrectly lists the date of the report as 6/28/2**1**.

[8] This is also known as the "Abel Assessment for Sexual Interest" test.

tied up in ropes longer than he looked at other pictures [and l]ooked at pictures of female children longer than he looked at other pictures." ***Id.*** at 112. "[C]ombined with [Father's] upbringing and family history, [as well as his] power, control, [and] anger management issues, Dr. Swope opined that Father "has a perversion that he doesn't have control over and that poses a risk of harm to [C]hild [and that Dr. Shienvold's evaluation] was an incomplete investigation into [Father's] problem because there was no standard method of doing a psychosexual evaluation [with] a psychosexual metric measure." ***Id.*** at 112-13, 121. ***See id.*** at 121-22 (Doctor Swope testifying Dr. Shienvold "just did not use empirically driven procedures [and] . . . data collection to determine [Father's] progress").

Moreover, Dr. Swope testified that she believed Father's IOP/DBT course was insufficient for an individual with his level of impairment/clinical pathology where he was never treated for his "sexual obsessive[,] compulsive[, and] excessive viewing of pornography." ***Id.*** at 120, 160. ***See id.*** at 123 (Doctor Swope testifying Abel assessment would be appropriate therapeutic tool to estimate probability of Father engaging in sexual mistreatment of Child); ***id.*** at 125-26 (in response to questioning by trial judge, Dr. Swope testifying Abel assessment is generally accepted in neuropsychological community for diagnosis and treatment of non-offenders and acknowledging assessment is "measure of interest, not of past behavior"), ***but see id.*** at 43 (Doctor Shienvold testifying Abel assessment "should more often be given when there's already . . . a conviction of [a] sexual offense"). Specifically, Dr.

- 10 -

Swope opined that Father needed six additional months of coaching or counseling by a licensed clinician, beyond the 13-week program he participated in, to sufficiently complete the DPT therapy. *Id.* at 160; *see also id.* (Doctor Swope testifying abbreviated 13-week IOP/DBT treatment Father completed focused on wrong objectives (anger and impulse control), rather than his severe impairment and treatment for sexual obsessive compulsive excessive viewing of pornography).

To accomplish the goal of unsupervised visits, Dr. Swope suggested the following treatment: (1) outpatient intensive, specialized treatment in a community-based setting; (2) the administration of a therapeutic polygraph test in conjunction with sexual history disclosure; (3) re-administration of the AASI-3 test; (4) biannual maintenance examinations (every six months); and (5) clinical interviews before, during, and after the polygraph and AASI-3 assessment. *See* Psychological Risk of Harm Evaluation by Amy M. Swope, Ph.D., 6/28/22, at 44-45. Doctor Swope's ultimate recommendation for Father was supervised visits with Child in a therapeutic treatment setting, parent-child dyad therapy, parental coaching, and parent-child interaction therapy. *Id.* at 45.

On March 28, 2023, the court held the first day of a three-day custody trial; Doctors Shienvold and Swope testified on behalf of Father and Mother, respectively. On April 24, 2023, the court held the second day of the parties' custody trial; Father and Father's mentor and visitation supervisor, Michael McCleary, testified at that proceeding. On May 10, 2023, the court held the

final day of custody hearings, at which Mother and Father testified. In reaching its final decision, the trial court acknowledged that it considered the witnesses' testimony, had reviewed all of the parties' exhibits, and assessed the credibility of all of the testimony in the case, giving the appropriate weight to each witness's testimony. *See* Opinion and Support of Final Order, 5/15/23, at 2. Notably, the court concluded that Mother had alienated Child from Father which, as a result, "completely eviscerated" Father's "ability to have any kind of a normal relationship with his daughter." *Id.* at 13; *id.* at 4 ("[Child's] time with [F]ather is totally inadequate and it [i]s having a material adverse effect on her at this point."); *id.* at 5 (court stating, "[Mother's] detest for and loathing of [F]ather is a life force . . . [i]t literally has a heartbeat [and Child] can read [Mother's] emotions, whether they are spoken or unspoken."). At the same time, the court acknowledged that Mother does an "excellent job" taking care of Child . . . both physically and educationally," *id.*, and that Child "is deeply loved in [M]other's home." *Id. See also id.* at 16 (trial judge acknowledging "[M]other in and of herself is an excellent mother").

Following the hearing, the court entered a final custody order granting shared legal custody to Mother and Father, giving Mother primary physical custody and Father partial **unsupervised** custody as follows: every Thursday after school until 8:00 or 8:30 p.m. (and from 4:00 p.m. over the summer), and alternating weekends starting Saturday at noon until Tuesday at school/daycare morning drop off. By agreement of counsel, Father's custody time commenced on Saturday, May 20, 2023, Father agreed to drop off Child

at school on Tuesday morning, May 23, 2023, and then on an alternating weekend schedule thereafter. Father was also granted visitation on Thursdays and alternating weekends during the summer, with two weeks of vacation. The court also made clear to the parties that "the goal [wa]s 50/50 [custody]." N.T. Custody Order, 5/8/23, at 5.

Due to the "extent of [parental] alienation in th[e] case," the court ordered reunification therapy/counseling, with any uncovered costs to be paid by Mother. The therapy/counseling was ordered "to commence as soon as possible through Dr. Shienvold's office [and, i]f he isn't able to do it, then it should commence as soon as possible with another provider, selected by [F]ather and either approved by [M]other or approved by the court upon petition." *Id.* at 4. Finally, the court cautioned Father as follows:

Furthermore, I think [F]ather takes an overnight trip with his daughter at his peril for the very same reasons that I have cautioned [F]ather that he might want to install video cameras in his own home. As a result, I fully expect such time as [F]ather may get "vacation" maybe a day or two or three in addition to his weekends over the summer, unless he would be able to take [Child] to another family member's home. But[,] even . . . in that case, given some of the testimony and some of the exhibits, that might not be a good idea.

*Id*. at 5. The court further provided that at no time was there to be unsupervised contact between paternal grandfather and Child. *Id.* At the conclusion of the hearing, the court asked the parties' attorneys if they had any other issues to address and both replied "no." *Id.* at 6.

Mother timely filed, simultaneously, a notice of appeal and court-ordered Pa.R.A.P. 1925(A)(2)(i) concise statement of errors complained of on appeal. She raises the following issues for our consideration:

(1)     Whether the trial court abused its discretion and/or erred in ignoring and/or failing to accept details, diagnostic tools, conclusions, recommendations[,] and expert testimony from ["]Threat of Harm["] evaluator, Dr. Amy Swope, as required by ***Lloyd v. Lloyd***, 889 A.2d 1246, ([Pa. Super. 2005)[,] and depriving the court of the expert's guidance on the ultimate issue of custody, to wit, what is the best interest of the child[.]

(2)     Whether the trial court abused its fact-finding discretion by totally ignoring the recommendations of Dr. Swope as though no recommendations were made at all[.]

(3)     Whether the trial court abused its discretion and/or erred in electing to blindly accept the testimony of Dr. Shienvold on the issue of Father's potential risk of harm to the child, given the first evaluation deemed Father a risk of harm and the second evaluation did not seek Mother's input, failed to consider collateral sources which may not be favorable to Father, and failed to utilize sexual predator psychological evaluation tools, particularly in light of [the fact that] Father's sexual behavior towards the child was [of the] utmost importance and should have been heavily weighted in the [c]ourt's decision[.]

(4)     Whether the trial court abused its discretion and/or erred [and] ignored the weight of the evidence, made credibility determinations in favor of Father simply because Mother's expert[']s conclusions were "off putting" to the [c]ourt and clearly demonstrated unjustified disdain for Mother, citing actions she reasonably took to protect the child initially, but the [c]ourt felt then "crossed into no man's land of parental alienation, when Mother would not voluntarily agree to Father having unsupervised rights five (5) years later[.]"

(5)     Whether the trial court abused its discretion and erred in determining that 23 Pa.C.S.[A.] § 5328, weighed in favor of Father, as the [c]ourt failed to consider the second part of the eighth factor, i.e.[,] except in cases of domestic violence where reasonable safety measures are necessary to protect

the child from harm, completely ignoring there was a determination by [O]C[YF] of Imminent Risk to the Child with Father as the perpetrator[.]

(6)     Whether the trial court committed an abuse of discretion and erred by making inconsistent rulings on the relevance and admissibility of evidence[.]

(7)     Whether the trial court abused its discretion and erred in completely disregarding competent and credible evidence[.]

(8)     Whether the trial court abused its discretion and erred in admitting evidence that violated the Rules of Evidence[.]

Appellant's Brief, at 4-6.

Mother's first four issues concern the trial court's decision to credit Father's expert witness's testimony over that of her own expert witness. Specifically, Mother contends that the court ignored or failed to accept "details, diagnostic tools, conclusions, recommendations[,] and expert testimony" from Dr. Swope's threat of harm evaluation and, as a result, "deprived the court of the expert's guidance on the ultimate issue of custody, to wit, what is the best interest of the child." Appellant's Brief, at 10.

On issues of credibility and weight of the evidence in custody matters, an appellate court defers to the findings of a trial court, which has had the opportunity to observe the proceedings and demeanor of the witnesses. It is well-established that "[t]he parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court in a custody proceeding is the best interest of the child." *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (citation omitted). Further, "[a]ppellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and the appellate court is

unable to find any abuse of discretion." ***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

Here, the critical issue on appeal, and the common theme in the parties' custody matter, is whether unsupervised visitation between Father and Child is in the "child's best interest," based primarily in part on Father's potential risk of harm to Child. That determination essentially boiled down to the experts' testimony and supporting reports.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept [the] findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Moreover, we have stated that:

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

Instantly, Dr. Swope's risk-of-harm evaluation was prepared in response to Mother's "concerns regarding [Father's] capacity to safely care for

[Child]." Psychological Risk of Harm Evaluation by Amy M. Swope, Ph.D, 6/28/21, at 2. Doctor Swope personally interviewed Father on two occasions in June 2022, reviewed a statement provided by Mother, and utilized "cumulative records, clinical interviews, collateral interviews [of Mother, a Church Elder at Father's church, Father's pastor, and Mr. McCleary], and psychometric testing[, consisting of the MCMI-IV and AASI-3, MMPI-2 assessments]." *Id.* Doctor Swope diagnosed Father with the following conditions: compulsive sexual disorder, paraphilia (unspecified-rule out), generalized anxiety disorder, affective disorder (unspecified), trauma-related disorder, and autism spectrum disorder (rule out). *Id.* at 40.

Doctor Swope concluded that Father "exhibited a pattern of problematic sexual behaviors [that] appear to be compulsive in nature." *Id.* at 41. She also concluded that, "in terms of [Father's] overall risk of harm to [Child, he] has not sufficiently altered his thought patterns and behaviors in a prosocial direction [and] had not acknowledged the extent of the negative consequences of his actions against [Mother or Child]." *Id.* Ultimately, Dr. Swope recommended Father continue to have supervised visits with Child, that they occur in a therapeutic treatment setting, that they include parent-child interaction and dyad therapies, and that Father have coaching during his visits to "promote healthy interactions with [Child]." *Id.* at 45.

Doctor Shienvold, who also prepared a risk-of-harm re-assessment of Father, concluded that Father did not have significant evidence of problems with impulse control or self-centeredness, that Father is much better at

controlling his anger and his "ability to prevent it from compromising his thinking," and that Father made "significant progress through his use of counseling" over the past two years. Psychological Risk Re-Evaluation by Kasey Shienvold, Psy.D., 9/28/21, at 2-3. In his professional judgment, Dr. Shienvold found that Father was no longer struggling with his emotions or having difficulty "managing his thinking, feelings, and actions." *Id.* at 3. Doctor Shienvold found that Father's risk to Child was significantly mitigated by his focus on self-improvement and willingness to reach out to others for help. *Id.*; *see also id*. (Doctor Shienvold opining Father has genuine desire to have healthier and more consistent relationship with Child). Ultimately, Dr. Shienvold recommended Father continue with his pastoral counseling and mentoring by community church members and concluded that, "[a]ssuming [Father] is willing to continue using his church and counseling as a resource for self-improvement, **it is determined that he is not a <u>significant</u> risk to the psychological and physical health** [**of Child**] at this time." *Id.* (emphases added).

During cross-examination, Mother's attorney asked Dr. Shienvold, "[g]iven that there was an imminent risk finding by [OCYF] in this PFA in which allegations were made[,] . . . did you not find it important to examine mental health concerns surrounding his sexual curiosity towards [C]hild?" N.T. Custody Trial, 3/28/23, at 40. In response, Dr. Shienvold testified that he talked to Father about his sexual curiosities regarding Child, *id.*, his use of pornography, the nature of the pornography he used, and Father's history of

sexual exploitation or sexual themes when he was young. *Id.* Doctor Shienvold, however, stated that it "would have been useful to have additional information from [OCYF] or from the [c]ourt regarding the PFA." *Id.* at 41. The expert also testified that he did not administer a specific sexual offender diagnostic test on Father because they often produce "a high rate of false positives" and "they should be administered in situations where someone has already been convicted [of] a sexual offense." *Id.* at 43.

The court found Dr. Shienvold "credible in all material aspects." Opinion in Support of Final Order of Custody, 5/15/23, at 7. With regard to Dr. Swope, the court concluded she was not credible, finding the facts she used to support her conclusions and recommendations were "inadequate," *id.*, noting she was "very evasive on cross-examination [and that she o]ftentimes ignore[ed] questions to return to her chorus line of answers and opinion." *Id.* The court also based its credibility determination of Dr. Swope, in part, on Mr. McCleary's testimony that he did not believe Dr. Swope's report "was a full and honest picture of their conversation." Opinion in Support of Final Custody Order, 5/15/23, at 4.

Mother faults Dr. Shienvold's conclusions, memorialized in his January 2021 re-evaluation report, for several reasons. Specifically, she criticizes the fact that the expert did not have the PFA petition, final PFA order, OCYF and CYF referrals, and copies of the emails, letters, and text messages Father sent Mother as supportive documentation for his evaluation and ultimate clinical recommendation.

Although Dr. Shienvold testified Father was forthcoming with the impure thoughts he had about Child when she was baby and disclosed to him that he had abused Mother on two or three occasions, *see* N.T. Custody Trial, 4/24/23, at 64, Dr. Shienvold also testified that when he conducts risk-of-harm assessments, his "standard process is to interview the other party[, here Mother,] involved in the action prior to meeting with the intended evaluee." N.T. Custody Trial, 3/28/23, at 17. However, there was no testimony that Dr. Shienvold attempted to reach out to Mother for the re-evaluation. *Id. See id.* at 19 (Doctor Shienvold testifying he prefers to have both parties reach out to him when doing evaluations "so we can hear specifically from [the party raising the concerns] what those concerns are to allow us to have additional sources of information when interviewing and evaluating the client in question"). In addition to not having copies of the PFA petition, PFA order, CYF referral and findings, or OCFY referral and report, *id.* at 24-25, 37-38, Dr. Shienvold also did not have access to copies of any of the text messages, letters, or emails that Father sent to Mother detailing Father's remorse for his prior abuse towards Mother and impure thoughts about Child. *Id.* at 37-38. *See also id.* at 37 (Doctor Shienvold testifying Father "never disclosed that he texted [Mother]" that he had sexual curiosity in Child); *id.* at 38 (Doctor Shienvold testifying he requested Father provide him information regarding OCYF caseworker information but that he never received it). In fact, Dr. Shienvold testified that, in his first evaluation of Father in 2019, he "didn't trust what [Father] said" and that if he had had specific information regarding

the PFA or the OCYF investigation of Father, which included a caseworker interview, he "will be the first one to admit that that would have been useful [] additional information" to have had. *Id.* at 41.

Furthermore, although Dr. Shienvold was aware that Father had a history of addiction to pornography and masturbation, he did not believe that an Abel assessment was indicated because "in my understanding there can be an increase[d] rate of false positives in non-offenders because of the nature of the test." *Id.* at 57; *see also id.* at 43. However, Dr. Shienvold also acknowledged that because he had never spoken to the OCYF caseworker involved in Father's matter, he did not know whether the imminent risk "rose to the level of such a significant concern . . . that [an Abel assessment] would have [been] recommended" for Father. *Id.* at 43-44.

While Dr. Shienvold had a summary of treatment from Father's pastoral counselor, because Dr. Shienvold did not have access to much of the documentation regarding concerns about Father's sexual feelings toward Child when he prescribed DBT therapy, Dr. Shienvold did not think that sexual offender therapy was the necessary next step in Father's treatment plan. *Id.* at 48; *see id.* at 49 (progress notes from Father's IOP/DBT therapist "did not specifically say [that he was] addressing sexual curiosity towards his daughter" in sessions, but "was more related to identifying target behaviors in life that are interfering [with his] quality of life, impulse control, crisis plan, [and] coping skills."). Finally, Father did not disclose to Dr. Shienvold at his re-evaluation that paternal grandfather was in prison after being convicted of

sexual offenses committed against Father's own sisters. *Id.* 55 (Doctor Shienvold testifying "family histories are incredibly impactful and relevant to our mental health [and] if [Father] was exposed to sexual abuse or sexual abuse violence, that can have a long-term impact on anybody's functioning in their own relationships . . . [and] psychological counseling . . . can certainly help mitigate any negative effects"). Also notable is Dr. Shienvold's response that it would have been helpful to have seen the statements Father made in the text messages to Mother regarding Child in order "for [him] to understand what route to take in evaluating [Father]." *Id.* at 63-64.

When Dr. Shienvold was asked whether Father is a risk of harm for custody of Child, the following exchange took place on direct examination:

> **Father's attorney**: Do you believe that [Father] is a risk of harm for custody of [C]hild?
>
> **Dr. Shienvold**: That's a—I—that's a very broad question. You have to define what you mean by custody. Are we talking, like—he hasn't been around [C]hild for a significant period of time. It sounds like in the better part of three or four years. So at this time I don't think he's a risk for being reintroduced **with expanding times** over the course of his relationship with [Child], no.

*Id.* at 32 (emphasis added). Notably, **Dr. Shienvold did not opine whether Father was a risk to Child if the court were to order unsupervised visits**, but, rather, that expanding Father's custodial time with Child was what he would recommend with regard to Father's relevant risk of harm to Child. *See id.* at 31-32 (Doctor Shienvold testifying risk factors present in initial 2019 evaluation were "substantially mitigated" as long as Father maintains support network and ongoing pastoral counseling).

At least one OCYF referral against Father was founded and deemed him to be a risk for sexual abuse of Child. Father has a history of addictive behaviors with regard to pornography and masturbation, habits he resorted to on a daily basis "to reliev[e] stress or tension" during the time Child resided with him and Mother. **See** Psychological Evaluation by Kasey Shienvold, Psy.D., 1/21/19, at 2. Father, himself, admitted that on at least one occasion he "had impure thoughts about [Child]." **Id.**

Based on the following significant facts, we conclude that the trial court abused its discretion in granting Father unsupervised overnight visits with Child for days at a time (Saturday at noon until Tuesday morning). In particular, the following facts support a conclusion that the trial court's order is not in Child's best interests: (1) Dr. Shienvold's admission that he would have found additional information regarding the PFA proceedings and OCYF investigations regarding Father useful for his initial evaluation; (2) Dr. Shienvold testifying that he **did not know** whether the OCYF referral "rose to the level of such a significant concern" that an Abel assessment or similar sexual offender diagnostic tool should have been used as part of Father's risk-of-harm evaluation; (3) Dr. Shienvold acknowledging that having text messages Father sent to Mother immediately after he expressed his sexual curiosity of Child would have been helpful in determining the proper route to evaluate Father; (3) and Dr. Shienvold's statement that he did not trust what Father said to him during his first evaluation.

It is well-established that when a court orders any form of custody, "the court shall determine the best interest of the child by considering all relevant factors, **giving weighted consideration to those factors which affect the safety of the child**[.]"  23 Pa.C.S.A. § 5328(a) (emphasis added).  Here, the court's determination to grant Father unsupervised overnight visits is not in Child's best interests where Father has not been deemed *not* to be a risk to Child, the therapeutic treatment Father's expert ordered was based, in large part, upon insufficient evidence and documentation provided to the evaluator of Father's own sexual history, and Father's own expert recommended the court expand the time Father and Child spend together (increasing amount of days/week or number of supervised hours per visit), but never mentioned unsupervised overnight visits as an appropriate next step.

Because Father's own expert testified Father should "be reintroduced with expanding times" with Child, the court's order granting Father unsupervised overnight visits is unsupported by record evidence.  While we understand the court's concern regarding the declining relationship between Child and Father, due in part to parental alienation on Mother's part, and acknowledge Father's efforts to rehabilitate, gradual or "expanded" custodial periods is more in order.  Gradual reintroduction and increased custodial time with Child can be accomplished in many ways short of immediately awarding three-night, unsupervised overnight visits where both experts concede Father

still poses some risk to Child.[9] Accordingly, we vacate the instant custody order.

In summary, we conclude that, after a comprehensive review of the notes of testimony from the parties' custody trial, the expert reports, and the entire certified record in the matter, the trial court's decision to grant Father unsupervised, overnight custodial time with Child is an abuse of discretion. *King v. King*, 889 A.2d 630, 636 (Pa. Super. 2005) (in child custody matter, we may not alter trial court's conclusions "provided they are supported by the record or unless they are manifestly unreasonable."). The court's findings are simply not supported by competent evidence of record. Moreover, while we defer to the trial court's credibility determinations, we are not bound by the court's deductions or inferences from its unsupported factual findings. *V.B.*, *supra*. Simply put, the court's decision today is not in Child's best interests, the polestar of any custody analysis.[10]

Order vacated. Case remanded. Jurisdiction relinquished. [11]

_____

[9] We can interpret Dr. Shienvold's overall impression that Father "is not a **significant** risk" to Child in no other way than that he is still a risk, to some degree, to Child.

[10] Having vacated the instant custody order, we need not address Mother's remaining arguments as to do so would be superfluous.

[11] We also recognize that section 5328(a)(2) mandates that the court consider "[t]he present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." 23 Pa.C.S.A. § 5328(a)(2); *see also id.* at §
*(Footnote Continued Next Page)*

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>12/18/2023</u>

---

5323(e) ("After considering the factors under section 5328(a)(2), if the court finds that there is an ongoing risk of harm to the child or an abused party and awards any form of custody to a party who committed the abuse or who has a household member who committed the abuse, the court shall include in the custody order safety conditions designed to protect the child or the abused party.").